FIDELITY & GUARANTY INSURANCE
COMPANY,

                **Plaintiff,**

-vs-                                  **Case No. 6:09-cv-595-Orl-31KRS**

FORD MOTOR COMPANY,

                **Defendant.**

_____

# ORDER

This matter came before the Court without oral argument upon consideration of the cross-motions for summary judgment (Docs. 151 and 153) filed by Plaintiff Fidelity & Guaranty Insurance Company ("Fidelity") and Defendant Ford Motor Company ("Ford"); the parties' respective responses in opposition thereto (Docs. 178 and 181); their replies (Docs. 187 and 188); and joint pre-trial statement (Doc. 164).

## I. Overview

This case arises out of Ford's alleged failure to defend and indemnify one of its dealerships, Heintzelman's Truck Center, Inc. ("Heintzelman's"), in a personal injury action against Bridgestone/Firestone, Ford and Heintzelman's.[1]

_____

[1] *See Thompson et al. v. Bridgestone/Firestone, Inc.*, Case No. 48-2001-CA-7891 (Fla. 9th Cir. Ct. 2001) [hereinafter the "underlying litigation" or "*Thompson* litigation"]. On March 17, 2010, the Court ordered Ford to produce a CD-R containing all documents on file in the *Thompson* litigation. (Doc. 165 at 1). The Court takes judicial notice of same pursuant to FED. R. EVID. 201. Due to prior limitations in the State Court's docketing system, docket entries are not numbered, often fail to reflect the correct filing date, and do not automatically include page numbers. Accordingly, the Court cites

Fidelity, as Heintzelman's insurer and subrogee, stepped in to defended Heintzelman's in the underlying litigation after Ford allegedly breached certain indemnification and defense agreements and withdrew its defense. Fidelity ultimately paid the Thompsons a significant (seven-figure) sum to settle claims of direct negligence against Heintzelman's. It now seeks to recover its settlement payment, attorneys' fees and defense costs from Ford.

For the reasons, *infra*, Ford had no obligation to defend Heintzelman's on the active negligence claims in the *Thompson* litigation; has no obligation to indemnify Fidelity for its settlement payment, attorneys' fees and costs; and is entitled to a judgment as a matter of law on all of Fidelity's claims.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. (Doc. 25 at 3).

## II. Undisputed Facts

### A. The Thompsons' Claims

On September 26, 2000, Paul Thompson was driving his employer's Ford F-350 pick-up truck on Interstate-4. Thompson was towing an overloaded trailer that contained a Bobcat loader and other heavy equipment. As Thompson neared Polk City, Florida, the truck's left rear tire blew out and he lost control of the vehicle. The truck ran off the highway and rolled over, causing Thompson severe personal injuries. On September 25, 2001, Thompson and his family brought a personal injury action against Bridgestone/Firestone (as the tire manufacturer), Ford (as the vehicle

---

documents in the *Thompson* litigation as "(D.E., [date, as indicated on docket sheet], [docket entry description] [exhibit number, if applicable] at [internal page number, if available]). Citations to this Court's docket are in the form of "(Doc. [docket entry number] at [page number])."

manufacturer) and Heintzelman's (as the dealership that sold the truck to Thompson's employer).

(DE, 09/25/01, Petition at 3).

The factual allegations in the Thompsons' complaint were that:

11.  HEINTZELMAN'S placed the subject vehicle into the stream of commerce.

12.  On or about September 26, 2000, [Thompson] was the operator of a 2000 Ford F-350 XL pick up truck. . .traveling East on I-4 . . . in Polk County, Florida.  At said time and place, the subject Firestone Steeltex LT 265/75SR16, load range E, steel belted radial tire, DOT number VDW81XM439 manufactured and/or distributed by Defendant FIRESTONE, mounted on the subject FORD vehicle, malfunctioned and catastrophically failed. . . .  As a result of the tire tread separation, the vehicle went out of control, and rolled over before coming to a final rest on the roof.

13.  The use of defective tires on the subject vehicle, a vehicle which is already unstable and highly prone to rollover, rendered the subject vehicle unreasonably dangerous and defective.  At the time FORD released the defective subject vehicle into the stream of commerce, non-defective tires were economically and technologically feasible and their use on the Ford F-350 XL would have been a safer alternative design . . . .

14.  The subject 2000 Ford F-350 XL was negligently designed in that it had a dangerous propensity to rollover, inadequate passenger restraint mechanisms, was difficult to control in emergency situations, and lacked adequate roof crush protection for its occupants.  As a result of the negligent design of the subject Ford F-350 XL, [Thompson] . . . was unable to control the vehicle when the FIRESTONE tire malfunctioned and catastrophically failed, and the vehicle left the roadway rolled [sic] over twice, and [Thompson] . . . was ejected from the vehicle and severely injured.

15.  As a direct result of the malfunction and catastrophic failure of the FIRESTONE Steeltex LT tire, the subsequent vehicle rollover, inadequate passenger restraint mechanism, and inadequate roof crush protection, [Thompson] . . . suffered serious bodily injury. . . .  Plaintiffs are entitled to damages and compensation for such injuries and consequence thereof. . . .

(DE, 09/25/01, Petition at 3, ¶¶ 11-15); (DE, 11/19/01, Amended Complaint at 2, ¶¶ 11-15).[2]

---

[2]The Thompsons filed an amended complaint on November 19, 2001.  (DE, 11/19/01, Amended Complaint).  Except for additional allegations pertaining to the State Court's personal jurisdiction over Bridgestone/Firestone, the amended complaint was nearly identical to the original.

The only substantive claim against Heintzelman's appeared in Count V:

(Negligence as to Defendant HEINTZELMAN'S)

43. Plaintiffs reallege and incorporate the above paragraphs. . . .

44. Defendant HEINTZELMAN'S sold the vehicle and tire to [Thompson's] employer . . . . Defendant HEINTZELMAN'S knew or should have known in the exercise of reasonable care that the subject tire and vehicle were or were likely to be dangerous when used in a manner foreseeable to Defendant HEINTZELMAN'S. Defendant HEINTZELMAN'S failed to adequately warn or otherwise protect Plaintiff from said dangers.

45. That the subject tire and vehicle were defective in design and said tire and vehicle lacked adequate warnings of such defects and/or the subject tire and vehicle were negligently manufactured, designed, and tested or the results of testing were not heeded. . . .

(DE, 11/19/01, Amended Complaint at 2, ¶¶ 43-45).

Importantly, the complaint omitted the fact that Thompson was towing a trailer at the time of the accident. Other than a design or production defect in the tire, no other cause of the accident was identified. (DE, 11/19/01, Amended Complaint at 2, ¶12).[3]

---

Concerning Heintzelman's, in particular, the parties agree that the amended complaint contained identical allegations and claims. (Doc. 153 at 3, ¶ 8, and Doc. 176 at 3, ¶ 8). The parties also agree that the amended complaint was the operative complaint at all times material to this case. Accordingly, the Court cites to the amended complaint.

[3]On the contrary, the gravamen of the complaint – as in the hundreds of other cases that were brought against Bridgestone/Firestone around this time – was that there was a defect in the truck's tires that resulted in catastrophic tread belt separation and that Ford's vehicles exacerbated that defect due to their own design flaws and increased propensity to rollover. Indeed, between 1991 and 2000, approximately 80 tire-related lawsuits were filed against Bridgestone/Firestone. *Sealed Court Records Kept Tire Problems Hidden*, USA Today 16 (Sept. 10, 2000); Keith Bradsher, *Tire Deaths are Linked to Rollers*, N.Y. Times C1 (Aug. 16, 2000) (discussing government data on tire tread separation and rollover deaths). After the confidential settlements in those cases became public and the National Highway Traffic Safety Administration commenced its investigation into the safety of certain Bridgestone/Firestone tires in the summer of 2000, the number of tread belt separation cases soared, eventually culminating in an effort to certify a nationwide class involving more than one million individuals nationwide. *See, e.g., In re Bridgestone/Firestone Inc. Tires Prods. Liab. Litig.*, 205 F.R.D. 503, 517 (S.D. Ind. 2001).

## B. The Course of the *Thompson* Litigation

At the outset of the case, counsel for Heintzelman's contacted Ford and requested that it provide Heintzelman's with a defense.[4] Ford's general counsel and its local counsel, Carlton Fields, P.A. and Francis McDonald, Esq. ("McDonald"), reviewed the foregoing allegations and the Thompsons' responses to Ford's initial discovery requests. (Doc. 153-4 at 12-18). McDonald concluded that the only claim against Heintzelman's was for "passive" negligence (i.e., Heintzelman's liability was predicated solely on the fact that it had placed the truck into the stream of commerce – not that it had improperly repaired or modified the vehicle, or had failed to warn Thompson's employer about the dangers of towing an overloaded trailer). (Doc. 153-4 at 17). Ford therefore agreed to assume Heintzelman's defense[5] and on January 23, 2002, the State Court granted Ford and Heintzelman's Joint Motion for Withdrawal and Substitution of Counsel. (DE, 1/23/2002, Order Granting Substitution of Counsel at 2).

For the next six years, Ford continued to defend Heintzelman's. In the middle of August 2007, however, McDonald learned that Thompsons' counsel was questioning an expert about the overloaded trailer during a deposition.[6] McDonald grew concerned that the Thompsons might be

_____

[4]Pursuant to its Sales and Service Agreement, as discussed further, *infra*, Ford was obligated to defend and indemnify Heintzelman's from certain product liability claims that did not involve the dealership's own active negligence.

[5]On January 9, 2002, Ford and Heintzelman's executed a document entitled "Terms of Agreement Between Ford Motor Company and Heintzelman's Truck Center, Inc. for Assumption of Defense in *Thompson vs. Bridgestone/Firestone, et al.*" (the "Assumption of Defense Agreement"), (Docs. 3 and 151-4). The terms of the Assumption of Defense Agreement are discussed, *infra*.

[6]McDonald was not present at the deposition and learned about the new line of questioning in an email from Brian Cross, Esq., an attorney who was not affiliated with McDonald's firm but who handled expert testimony for Ford on a nationwide basis. (Doc. 153-4 at 81-82). Neither party has objected to the use of this evidence on summary judgment.

pursuing a new theory of liability against Heintzelman's and decided to speak with the

Thompsons' attorney, Bruce Kaster, Esq. ("Kaster") (Doc. 153-4 at 83-84). After a pre-trial

hearing on August 21, 2007, McDonald testified that he and Kaster had the following

conversation:

> McDonald: Bruce, I've got to ask you point-blank, are you guys making a[n] independent theory of liability against Heintzelman's?
>
> Kaster: Yes, we are.
>
> McDonald: Well, Bruce, if you are, you know I'm going to have to withdraw from representing them as counsel.
>
> Kaster: Well, you got to do what you got to do, but we're making that – that theory against Heintzelman's.

(Doc. 153-4 at 91).[7]

After McDonald's conversation with Kaster, Ford instructed McDonald to re-tender the

defense of Heintzelman's. (Doc. 153-4 at 95 and 98). On August 22, 2007, the day after the pre-

trial hearing, McDonald wrote to Heintzelman's former counsel (who had represented

Heintzelman's only briefly at the outset of the case before Ford accepted the tender):

> In recent discussions I have had with [the Thompsons'] counsel, Bruce Kaster, he has confirmed that the negligence count contained in the Amended Complaint against Heintzelman's Truck Center, Inc., [sic] is intended to be a claim for

_____

[7]In its response, Fidelity objected to this evidence as impermissible hearsay. (Doc. 181 at 5). However, Fidelity has not only conceded that this conservation took place (Doc. 153 at 7), but actually represented to the State Court, during a hearing on November 15, 2007, that McDonald had confirmed with Kaster that the Thompsons were asserting an active negligence theory. (Doc. 151-13 at 5). Furthermore, in the parties' joint pre-trial statement and Fidelity's reply, Fidelity has admitted that Thompsons' counsel "informed Ford's counsel that they intend[ed] to allege, for the first time, active negligence by Heintzelman's. Specifically, [the Thompsons] alleged that Heintzelman's was actively negligent because they had specific knowledge that CEM was pulling a trailer in excess of the recommended towing capacity. . . ." (Doc. 164 at 11); (Doc. 188 at 2).

independent negligence, separate and apart from simply being a good faith seller of the subject truck.

Pursuant to the [Assumption of Defense Agreement], Ford is retendering the defense of Heintzelman's in this matter back to Heintzelman's. . . .

Since agreeing to assume the dealer's defense, Ford has learned that there is no dispute that the trailer Mr. Thompson was towing at the time of his crash was overloaded beyond the capacity of the truck. Understanding the importance of this evidence, [the Thompsons] are now taking the position that representatives of Heintzelman's knew of the types of uses and loads CEM Enterprises, Inc. (the purchaser of the truck and Mr. Thompson's employer) was putting this and other trucks to, and either acquiesced in these misuses, or sold CEM trucks with reduced towing capacities, knowing that CEM would be loading the trucks beyond these capacities.

We have uncovered no evidence that in any way would support such a claim. Having said that, however, we do not feel we can continue to represent the interests of both Ford and Heintzelman's, given the nature of the claim. . . .

I am . . . enclosing a Joint Motion to Retender Defense and for Substitution of Counsel for Heintzelman's Truck Center, Inc., for your signature. Please return it to me once you have signed it and I will forward it to Judge Sprinkel. . . .

(Doc. 153-10 at 1-2).

In a letter dated August 28, 2007, Heintzelman's former counsel informed McDonald that he was no longer counsel for Heintzelman's and that he would not execute the Joint Motion to Retender Defense and for Substitution of Counsel because McDonald continued "to remain record counsel for Heintzelman's Truck Center, Inc." (Doc. 151-6 at 1).[8]

------------------------

[8]After learning that Heintzelman's former counsel would not accept the re-tender, McDonald wrote directly to Heintzelman's and informed it, in substantially the same terms as above, that Ford was re-tendering the defense to Heintzelman's and that Heintzelman's should contact its insurance carrier as soon as possible "so that they can retain new counsel to defend Heintzelman's interests as soon as possible." (Doc. 151-8 at 2). On October 17, 2007, John Fleming, a claims adjuster for Fidelity, objected to the re-tender and notified Ford that Heintzelman's was reserving its right to seek indemnification. (Doc. 164 at 18).

On August 29, 2007, Ford propounded its Second Set of Interrogatories on the Thompsons, asking, *inter alia*: "Do you contend that Heintzelman's Truck Center, Inc., recommended or condoned utilization of the subject F-350 with the tow configuration present at the time of the crash? If so, please describe all documents, testimony or anticipated testimony which supports your conclusion." (Doc. 151-7 at 4-7); (DE, 8/30/2007, Notice of Service of Second Interrogatories to Plaintiffs). On September 28, 2007, the Thompsons answered, confirming their new theory of liability. (Doc. 151-10); (Doc. 164 at 12). While they objected on a variety of grounds, they swore that they were contending that "Ford and/or Heintzelman's Truck Center knew or should have known" the uses to which Thompson's employer would put the truck and that "Heintzelman's Truck Center and Ford sold the subject vehicle to [Thompson's employer] with the towing package installed." (Doc. 151-10 at 4).

On November 2, 2007, Heintzelman's new counsel – Lydecker, Lee, Behar, Berga & de Zayas, LLC and Mark Hendricks, Esq. ("Hendricks") – made their first appearance. (DE 11/2/2007, Notice of Production of Non-Party, at 1-2).[9] Three days later, Heintzelman's moved to strike the case from the trial docket and sought a continuance arguing, *inter alia*, that six years into the litigation and just three months before trial, the Thompsons' had asserted an entirely new theory of active negligence against Heintzelman's. (DE 11/5/2007, Motion to Strike at 1-3).[10] The

---

[9]McDonald did not withdraw – and the Lydecker firm and Hendricks were not substituted as counsel – until (if at all) November 16, 2007. (DE 11/16/2007, Stipulation for Substitution of Counsel). Lydecker did not execute the Joint Motion to Retender Defense and for Substitution of Counsel for Heintzelman's Truck Center, Inc. that McDonald had prepared. Instead, it prepared a "Stipulation of Substitution of Counsel" form – not a motion – (Doc. 164 at 18), which was never presented to the State Court for approval or approved by same. (DE 11/16/2007, Stipulation of Substitution of Counsel).

[10]In the parties' joint pre-trial statement, Fidelity concedes that Heintzelman's November 2, 2007 motion to strike was based on a new theory of liability. (Doc. 164 at 12). Furthermore, in the

State Court held a hearing on November 15, 2007. (Doc. 151-13 at 1). At the hearing, Hendricks repeatedly acknowledged that the original theory of liability against Heintzelman's was based only on passive negligence and that the Thompsons' were now adding a "completely new theory of active negligence." (Doc. 164 at 13). The State Court extended the trial date.

On November 20, 2007, McDonald sent an email to Hendricks and assured him that Ford would defend Heintzelman's on the passive negligence claim:

> If the active negligence claim is resolved in Heintzelman's favor, as it should be, Ford will abide [by] the dealer agreement and defend Heintzelman's for claims that are directly simply [sic] at pass-through liability, i.e., Heintzelman's is responsible because it sold a product that contained a latent defect it had no way of knowing about. Ford will not indemnify the costs incurred by Heintzelman's for defending the active negligence claim because that claim, based on alleged negligent conduct by Heintzelman's during the sales activity, is not a covered event under the Dealer Sales and Service Agreement, nor the Indemnification Agreement.

(Doc. 151-15 at 1).

On February 8, 2008, Heintzelman's moved for summary judgment on the Thompsons' active/direct negligence claims. (DE 2/12/2008, Motion for Summary Judgment). Even assuming, *arguendo*, that the Thompsons had adequately pled an active negligence claim, Heintzelman's contended that, as a matter of Florida law, it could not be held liable for failing to warn Thompson's employer of the potential dangers of using a truck to tow a trailer that exceeded the weight specifications provided in the owner's manual. (DE 2/12/2008, Motion for Summary Judgment at 2, 4 and 9-16).

---

Thompsons' November 13, 2007 response to Heintzelman's motion they asserted: "[H]eintzelman [sic] knew what Thompson's employers were using, that Heintzelman [sic] regularly visited Thompson's employer's worksite and Heintzelman [sic] had a relationship with Thompson's employer. . . . If, in fact the towing package was improper. . .Heintzelman should not have sold this vehicle to the [Thompson's employer]." (Doc. 164 at 12).

On March 14, 2008, while Heintzelman's motion for summary judgment remained

pending, the Thompsons sought leave to amend their complaint. (DE 3/17/2008, Motion to

Amend).[11] Four days later, they responded to the motion for summary judgment. (DE 3/19/2008,

Response). In their response, the Thompsons asked for a continuance (based on their proposed

amendment). (DE 3/19/2008, Response at 2 and 7). However, they also relied upon an affidavit

from the CEO of Thompson's employer, CEM Enterprises, Inc. In his affidavit, the CEO swore

that he had discussed his company's need for vehicles with sufficient towing capacity with Kitty

Barnett, Heintzelman's sales representative; that Ms. Barnett regularly came to CEM and was

aware that CEM regularly pulled Bobcats and other heavy equipment on its trailers; that he relied

upon Ms. Barnett to supply CEM with vehicles that met CEM's needs; and that, on at least one

occasion, Heintzelman's had supplied CEM with a truck that was equipped with tires that had an

inadequate load capacity and Heintzelman's came to CEM to replace those tires. (Doc. 178-15 at

3-4).

---

[11]In their proposed amendment, the Thompsons asserted:

> 44. [D]efendant HEINTZELMAN'S supplied Paul Thompson and Thompson's
> employer with a truck which had the improper towing capacity for their needs, when
> HEINTZELMAN'S and/or its agents had specific knowledge that [Thompson's
> employer] and its employees intended to tow or pull fully loaded dual and triple axle
> trailers loaded with Bobcats or other heavy equipment. . . . Further
> HEINTZELMAN'S knew or should have known that [Thompson's employer] was
> towing trailers which were exceeding the recommended towing capacity of the Ford
> F350 vehicles which they were selling. . . . HEINTZELMAN'S was negligent in
> selling the subject Ford F350 to [Thompson's employer]. . . . Defendant
> HEINTZELMAN'S employees regularly visited [Thompson's employer's] place of
> business and knew or should have known [their] trailer towing needs.

(DE 3/17/2008, Motion to Amend at 12-13, ¶ 44). The State Court never ruled on the motion and the
proposed amendment was never consummated.

The day after the Thompsons responded to the motion for summary judgment,

Heintzelman's and Fidelity agreed to settle all of the active negligence claims against

Heintzelman's.  In a March 19, 2008 email to one of Fidelity's claims adjusters, Hendricks stated:

> This will serve as a status of our ongoing efforts to reach a settlement of the
> direct/active negligence claims against Heintzelmans [sic] in this matter. [The
> Thompsons] have agreed to provide a partial release of all active and/or direct claims
> against the dealership but allow the "pass thru" [sic] claim for strict liability against
> Heintzelmans [sic] to continue to survive so as to avoid the "empty chair" argument.
> Plaintiff will agree to "roll over" on our [motion for summary judgment at tomorrow's
> hearing].  We anticipate the court will grant the motion, however, the dealership will
> be released on any and all active negligence or directly liability claims irrespective of
> the outcome of the hearing. . . .  We are still waiting to hear back from Ford on their
> "blessing" and reconfirmation of its contractual indemnity obligations under the
> Ford/Heintzelman [sic] dealership agreement and the agreement for the assumption of
> the defense entered into for this case. . . .

(Doc. 151-18 at 1).

Hendricks sent a similar email to McDonald and McDonald's co-counsel on March 19,

2008, but omitted the fact that the Thompsons had agreed to "roll over" on Heintzelman's motion

for summary judgment.  (Doc. 151-19 at 1-2).  Later that evening, McDonald responded:

> [W]e'll try and get you an answer as soon as we can get with our Ford representative.
> As you will recall, we did not re-tender the defense of Heintzelman's for the pass-
> through (design) liability claims asserted by [the Thompsons] against Heintzelman's.
> Ford intends to defend and protect the dealer for those claims if they are not part of any
> settlement you reach with [the Thompsons]. . . .  [F]ord remains willing to defend the
> dealer for pass-through (indirect) liability as per the Dealer Sales and Service
> Agreement and there is no need for Heintzelman's to have separate counsel any longer.
> I encourage you to clearly deliniate [sic] in any settlement agreement and release with
> [the Thompsons] that each and every claim of independent liability, whether couched
> in negligence or failure to warn, be released. . . .

(Doc. 151-19 at 1).

On March 20, 2008, the State Court held a hearing on Heintzelman's motion for summary

judgment.  (Doc. 176-2 at 1).  At the outset of the hearing, Judge Sprinkel asked the Thompsons'

attorney in no uncertain terms whether the parties had already reached some sort of agreement: "All right. Well – I mean, you-all already agreed on something here? Is there good news?" (Doc. 176-2 at 3). In remarkable lack of candor, Kaster responded: "No, but I think – well, I'll let them speak." (Doc. 176-2 at 3).[12] Seconds later later, Hendricks made a perfunctory and conclusory argument in favor of Heintzelman's motion and Kaster quickly went on to represent that Heintzelman's motion was "compelling" and that he believed the court would grant it ("I have had my appellate lawyers look at it, and their case law is clear and compelling. I anticipate that you'd probably grant it. . . .") (Doc. 176-2 at 4). Without any knowledge of the settlement and in the absence of any apparent opposition,[13] the State Court granted the motion, leaving only a passive strict liability claim against Heintzelman's (or, as Kaster remarked: "And . . . what's left then is them placing the vehicle in the stream of commerce.") (Doc. 176-2 at 5).

---

[12]The Court directed the parties to answer the following question in their replies: "Why [did] counsel for the Thompsons and Heintzelman's . . . not disclose the fact that they had settled the active/direct negligence claims against Heintzelman's during the March 20, 2008 hearing before Judge Sprinkel?" (Doc. 185 at 4). Ford responded that, despite the settlement, only a judgment would have prevented Bridgestone/Firestone and Ford from "apportioning fault to Heintzelman's as a *Fabre* defendant [at trial], and thereby provided leverage in any future settlement discussions with those parties." (Doc. 187 at 2) (footnote omitted). Fidelity responded that, at the time, it only had an oral "understanding with the Thompsons that was not yet reduced to writing" and was therefore "forbidden" from informing the State Court of the settlement pursuant to the mediation privilege in FLA. STAT. § 44.405(4). For a variety of reasons, which need not be addressed now, the Court finds Fidelity's response incredible.

[13]It is undisputed that, at the time of the hearing, while McDonald knew that the Thompsons and Fidelity/Heintzelman's had been negotiating a settlement, he did not know that the settlement had been finalized or that the Thompsons' counsel had agreed to simply "roll over." Furthermore, Hendricks deliberately "canceled the court reporter for [the hearing on Heintzelman's motion for summary judgment] so as not to have a record of the proceedings." (Doc. 162-9 at 2). Because Bridgestone/Firestone insisted on having a court reporter present, however, a transcript of the hearing was made. (Doc. 162-9 at 2).

The day after the hearing, Kaster and Hendricks received the following letter from the mediator who brokered the settlement:

> This will confirm resolution of the claims of active, independent negligence of Heintzelman [sic] in the above matter. . . . It is understood that Heintzelman will remain in the case under the distributorship/pass-through theory only. The summary judgment will proceed without "active" contest by [the Thompsons'] counsel. This resolution is binding regardless of the court's ruling on the motion for summary judgment. A release consistent with these terms will be executed in exchange for the monetary consideration identified above. . . .

(Doc. 151-22 at 1).[14]

On March 28, 2008, McDonald wrote Hendricks:

> In view of the ruling granting Heintzelman's Truck Center's motion for summary judgment, Ford and Carlton Fields stand ready to defend and protect the remaining, pass-through liability claims pending against Heintzelman's. There is no need for Heintzelman's to continue to pay for its own attorneys. Please furnish me with a copy of the settlement agreement between Heintzelman's and [the Thompsons] so that I can insure [sic] that all the independent claims have been released. . . .

(Doc. 151-23 at 1).

Fidelity and Heintzelman's rejected the offer. Instead, they waited nearly six months for Ford to settle all of the remaining claims with the Thompsons[15] – including pass-through/strict liability claims against Heintzelman's – and, on October 3, 2008, executed the release pursuant to the earlier terms of their settlement with the Thompsons. (Doc. 164 at 15). Less than three weeks later, Fidelity brought the instant action.[16]

---

[14]Although counsel received the letter the day after the hearing, the mediator drafted it prior to the hearing. (Doc. 164 at 14).

[15]Ford filed its Joint Stipulation for Dismissal on or about October 21, 2008 and the State Court entered its Order approving the dismissal the next day. (DE, 10/21/2008, Joint Stipulation for Dismissal); (DE, 10/22/2008, Order of Dismissal).

[16]Fidelity and Heintzelman's surplus insurance carriers originally filed suit in Orange County Circuit Court on October 22, 2008. (Doc. 1). Ford was not able to remove the case to this Court until April 3, 2009. (Doc. 1).

**C. The Indemnification Agreements**

As noted, *supra*, there are two contracts at issue in this case. The first is the Sales and Service Agreement, and the amendments thereto, that Ford and Heintzelman's originally executed in 1987. (Doc. 178-1). The parties agree that the Sales and Service Agreement should be interpreted and construed in accordance with Michigan law. (Doc. 151 at 10 and 153 at 19, n.16). In pertinent part, the Sales and Service Agreement provides:

> INDEMNIFICATION BY [FORD]. [Ford] shall defend, indemnify, hold harmless and protect [Heintzelman's] from any losses, damages or expense, including costs and attorney's fees, resulting from or related to lawsuits, complaints or claims commenced against [Heintzelman's] by third parties concerning:
>
> (1) [B]odily injury . . . arising out of an occurrence caused solely by a "production defect" in that product (i.e., due to defective materials or workmanship utilized or performed at the factory), except for any "production defect" in tires and diesel engines made by others, provided, however, that the "production defect" could not have been discovered by [Heintzelman's]. . . .
>
> (2) [B]odily injury . . . arising out of an occurrence caused solely by a defect in the design of that product, except for a defect in the design of tries or diesel engines made by others. . . .
>
> In the event that any legal action arising out of any of these causes is brought against [Heintzelman's], [Ford] shall undertake, at its sole expense, to defend said action on behalf of [Heintzelman's] when requested to do so by [Heintzelman's], provided that [Heintzelman's] promptly notifies [Ford] in writing of the commencement of the action . . . and cooperates fully in the defense of the action in such manner and to such extent as [Ford] may reasonably require. . . . Should [Ford] refuse to undertake the defense on behalf of [Heintzelman's], or fail to undertake an adequate defense, [Heintzelman's] may conduct its own defense and [Ford] shall be liable for the cost of such defense, including reasonable attorney's fees, together with any verdict, judgment or settlement paid by [Heintzelman's] (provided, however, that [Heintzelman's] shall notify [Ford] within a reasonable period of any such settlement) . . . .

(Doc. 3 at 16-18 and Doc. 178-1 at 33-36).

The second agreement is the Assumption of Defense Agreement, which provides, in material part:

1.  Ford . . . agrees to assume the defense of [Heintzelman's] in the [*Thompson* litigation].

2.  Ford will control the defense of this case on behalf of both [Heintzelman's] and Ford.  Ford will pay all attorney's fees and costs as they are incurred from the date of [Heintzelman's] signature as indicated below and from this point forward.  Ford will be responsible for 100% of any money judgment for compensatory of [sic] general damages entered, or settlement paid, regardless of whether such judgment or settlement is entered or made against Ford or [Heintzelman's] jointly, or only as against one.  However, Ford will only be individually responsible to satisfy a judgment for punitive damages as against it alone.

3.  The agreement to defend and indemnify will remain in effect only so long as the facts continue to indicate, as they do now, that the dealer has no independent liability for any of the damages suffered or claimed by plaintiffs arising out of acts or omissions of [Heintzelman's]. . . .  In the event Ford becomes aware of new and credible evidence suggesting that Ford and [Heintzelman's] no longer have a unity of interest in the defense of this case, Ford shall have the right, at its sole option, to withdraw from the defense and indemnification of [Heintzelman's] and re-tender the defense. . . . Ford will notify [Heintzelman's] attorneys as soon as possible about any evidence which would support allegations of independent liability. . . .

4. [Heintzelman's] represents that it knows of no facts or circumstances which would or could suggest that any independent claim of liability exists against [Heintzelman's] for the acts or omissions of [Heintzelman's]. . . .

(Doc. 3 at 32 and 151-4 at 1).

The parties dispute whether the Assumption of Defense Agreement should be interpreted and construed in accordance with Michigan or Florida law.[17]  Fidelity contends that Florida law is controlling.  For purposes of this Order, the Court has simply assumed, without deciding and without any analysis, that the Assumption of Defense Agreement is a separate, freestanding contract that should be interpreted and construed in accordance with Florida law.

---

[17]Ford also contends that the Assumption of Defense Agreement must be read in conjunction with the Sales and Service Agreement and that the agreements must be read as one contract.  Fidelity contends the Assumption of Defense Agreement is a separate, distinct and freestanding agreement.

### III.  Applicable Law

#### A.  Summary Judgment

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no

probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

With respect to determining contractual indemnification issues, summary judgment is generally appropriate inasmuch as the construction and legal effect of a written contract are matters of law to be determined by the Court.  *See*, *e.g.*, *Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.*, 286 F.3d 1233, 1262 (11th Cir. 2002) (noting that the interpretation of an indemnity contract "normally raises question of law for the court to resolve"); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1477 (11th Cir. 1992); *see also Chrysler Corp. v. Brencal Contractors, Inc.*, 381 N.W.2d 814, 818 (Mich. Ct. App. 1985).

### B.  Indemnification

### 1.  Contractual Indemnification Under Michigan Law

In Michigan, the "general rules for contractual indemnity apply to claims of indemnity in commercial transactions, rather than the specific rules governing an insurer's duty to defend." *Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 686 N.W.2d 756, 762 (Mich. Ct. App. 2004) (citations omitted) [hereinafter "*Grand Trunk*"].  "[A]n indemnity contract is to be construed in the same fashion as other contracts."  *Zahn v. Kroger Co.*, 764 N.W.2d 207, 210 (Mich. 2009) (citations omitted).  If the language of the contract is clear and unambiguous, the contract should be construed according to its "plain sense and meaning."  *Id.* at 211.  "Courts may not make a new contract for parties under the guise of a construction of the contract, if doing so will ignore the plain meaning of the words chosen by the parties."  *Id.*  Furthermore, the extent of the duty to defend and indemnify must be determined from the language of the contract itself.  *Grand Trunk*, 686 N.W.2d at 763; *Zahn*, 764 N.W.2d at 210-11.  Finally, if an "indemnitor has notice of an action and declines the opportunity to defend it, the general rule is that the indemnitor will be

bound by any reasonable, good faith settlement the indemnitee might thereafter make." *Grand Trunk*, 756 at 763 (citation omitted). To recover in these circumstances, however, the indemnitee must prove that: (1) the indemnitor was timely notified of the claim and refused to defend it; (2) the factual situation giving rise to the claim was covered by the agreement; and (3) the settlement was reasonable. *Grand Trunk* at 763-64; *Trim v. Clark Equip. Co.*, 274 N.W.2d 33, 36 (Mich. Ct. App. 1978).

### 2. Contractual Indemnification Under Florida Law

In Florida, courts construe indemnity contracts according to ordinary rules of contract construction. *Improved Benevolent & Protected Order of Elks of the World, Inc. v. Delano*, 308 So. 2d 615, 617 (Fla. 3d DCA 1975). The intent of the parties and the scope of the indemnification provision are derived from the language of the contract and the circumstances in which it was made. *Id.*; *see also Univ. Plaza Shopping Ctr. v. Stewart*, 272 So. 2d 507, 511 (Fla. 1973); *Gibbs v. Air Canada*, 810 F.2d 1529, 1533 (11th Cir. 1987). The terms of the contract determine whether the indemnitor is obligated to reimburse the indemnitee for a particular claim. *Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1077 (Fla. 5th DCA 2003) (citations omitted). However, contracts that attempt to indemnify a party against its own negligence are disfavored and will only be enforced if the contract clearly and expressly states that the indemnitee's own wrongful acts are indemnified. *Stewart*, 272 So. 2d at 511*; Welch v. Complete Care Corp.*, 818 So. 2d 645, 650 (Fla. 2d DCA 2002) (citing *Charles Poe Masonry, Inc. v. Spring Lock Scaffolding Rental Equip.*, 374 So. 2d 487, 489 (Fla. 1979)); *see also Gulf Oil Corp. v. Atlantic Coast Line R.R. Co.*, 196 So. 2d 456, 457 (Fla. 2d DCA 1967); *Fla. Power & Light Co. v. Elmore*, 189 So. 2d 522, 523 (Fla. 2d DCA 1966). To recover, the indemnitee has the burden of proving: (1) a breach of the indemnity contract; (2) the amount of the loss sustained; (3)

the existence of the facts for which there was coverage; and (4) the reasonableness of the amount paid. *Port Everglades Auth. v. R.S.C. Indus., Inc.*, 351 So. 2d 1148, 1150 (Fla. 4th DCA 1976) (citations omitted).

### 3. Common Law Indemnification[18]

To prevail on a claim for common law indemnity, the plaintiff must satisfy a two-prong test: (1) the party seeking indemnification must be without fault, and its liability must be vicarious and solely for the wrong of another; and (2) indemnification can only come from a party who was at fault. *Dade County Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 642 (Fla. 1999). Common law indemnity is not available between joint tortfeasors and can "only be applied where the liability of the person seeking indemnity is solely constructive or derivative and only against one who, because of his act, has caused such constructive liability to be imposed." *Houdaille Indus., Inc. v. Edwards*, 374 So. 2d 490, 493 (Fla. 1979); *see also Stuart v. Hertz Corp.*, 351 So. 2d 703, 705 (Fla. 1977) (where two tortfeasors are "chargeable with active or affirmative negligence contributing to the injury for which recovery was had, neither is entitled to indemnity from the other."); *Amisub of Fla., Inc. v. Billington*, 560 So. 2d 1271 (Fla. 3d DCA 1990).

---

[18]The parties agree that Florida common law is controlling with respect to Fidelity's claim for common law indemnification. (Doc. 164 at 19).

## IV. Discussion

Fidelity has asserted four claims against Ford.[19]  In Count I, Fidelity asserts that Ford breached the Sales and Service Agreement by re-tendering its defense and failing to indemnify Heintzelman's for its settlement payment, defense costs and attorneys' fees.  (Doc. 3, ¶¶ 26-32).  Similarly, in Count II, Fidelity asserts that Ford breached the Assumption of the Defense Agreement by re-tendering its defense and failing to indemnify Heintzelman's for its settlement payment, defense costs and attorneys' fees.  (Doc. 3, ¶¶ 33-37).  In Count III, Fidelity asserts a claim for common law indemnification.  (Doc. 3, ¶¶ 38-41).  Finally, in Count IV, Fidelity asserts that Ford's failure to defend and indemnify Heintzelman's violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").[20]  (Doc. 3, ¶¶ 42-50).

This case has been pending for nearly one and one-half years.  Between April 2009 and April 2010 alone, more than 180 docket entries have been made.  Notwithstanding Fidelity's efforts to obfuscate the issues, this case warrants little discussion.

### A.  Count I – Breach of the Sales and Service Agreement

As noted, *supa*, the only third-party bodily injury claims covered by the Sales and Service Agreement are for claims arising out of:

> A "production defect" in a Ford product (i.e., due to defective materials or workmanship utilized or performed at the factory), except for a defect in the design of tries or diesel engines made by others, that could not have been discovered by the dealer; or

> A defect in the design of a Ford product, except for a defect in the design of tries or diesel engines made by others.

---

[19]On May 21, 2009, the Court dismissed Count V of the Amended Complaint, which asserted a claim for breach of the implied covenant of good faith and fair dealing.  (Doc. 25 at 8).

[20]*See* FLA. STAT. § 501.201 *et seq.*

On its face, this plain and unambiguous language obligated Ford to defend and indemnify[21]

Heintzelman's on two types claims: (1) those arising out of "production defects;" (2) and those

arising out of "defects in the design" of a Ford product. (Doc. 178-1 at 34-35). Nothing in the

Sales and Service Agreement obligated Ford to defend Heintzelman's on claims arising out of the

dealership's own negligence or wrongful acts (if anything, Heintzelman's was obligated to defend

Ford on a limited subset of those claims). Accordingly, any moneys spent in defense of active

negligence claims against Heintzelman's – including any settlement payments, costs and attorneys'

fees – were clearly not covered by the Sales and Service Agreement.

Despite the foregoing, Fidelity contends that Ford breached the Sales and Service by, *inter*

*alia*,[22] refusing to defend and indemnify Heintzelman's "despite the lack of any evidence, facts, or

substantial allegations that suggested Heintzelman's *contributed to the alleged product defect*."

(Doc. 164 at 4) (emphasis added).[23] The contention is without merit. Whether Heintzelman's

_____

[21]In the insurance context, the duty to defend and the duty to indemnify are distinct obligations. Here, however, as in *Grand Trunk*, Ford's duty to defend and indemnify were coextensive. 686 N.W.2d at 763 (finding that indemnitor's "contractual duty to defend [was] coincident with the duty to indemnify" where contract specified that indemnitor agreed "to indemnify, defend, protect and save harmless" the indemnitee). Accordingly, the Court's analysis does not distinguish between these duties.

[22]Fidelity also contends that "The Assumption of Defense Agreement replaced the Sales and Service Agreement, to the extent it dealt with indemnification and defense in the Thompson Lawsuit" (Doc. 164 at 4). That contention is addressed, *infra*.

[23]In support of this proposition, Fidelity relies on *Underwood v. Bridgestone/Firestone*, Case No. 05:01-cv-251, 2006 WL 3086874 (N.D. Fla. Oct. 27, 2006), a decision which was wisely vacated pursuant to intervening Michigan case law and a settlement agreement between Ford and one of its dealerships. *Underwood*, Case No. 05:01-cv-251 (Docs. 40 and 41) (N.D. Fla. Nov. 28 and Dec. 1, 2006). In short, even assuming, *arguendo*, that *Underwood* had not been vacated, the decision is inapposite and unpersuasive because it applied Michigan insurance law – not contractual indemnification – to determine the scope of Ford's duty to defend and indemnify. 2006 WL 3086874 at *2. Ford is clearly not an insurer and Michigan law does not hold Ford to the higher standards imposed on insurers. *Grand Trunk*, 686 N.W.2d at 762-63.

contributed to the alleged product defect is of no moment.  The Sales and Service Agreement says nothing whatsoever about "contributing to an alleged product defect."

As inartful and poorly drafted as the Thompsons' complaint was, there can be no question that Ford was obligated to, and did in fact, defend Heintzelman's from the outset of the litigation until at least November 16, 2007.[24]  As of November 16, 2007, however, the Thompsons' claim was no longer that Heintzelman had simply placed the truck into the stream of commerce, but that Heintzelman's was actively negligent in failing to warn Thompson's employer about the truck's towing capacity.  In addition to the Thompsons' new line of deposition questions and McDonald's conversation with Kaster, Ford knew at this time that: (1) Thompson was towing an overloaded

---

[24]The parties treat the re-tender and withdrawal of Ford's representation as an ambiguous question of fact.  *Compare* (Doc. 164 at 11, noting that "Ford retendered the defense to Heintzelman's" on August 22, 2007) *with* (Doc. 164 at 18, "Carlton Fields, P.A. jointly defended Ford and Heintzelman's . . . from approximately January 2002 through September 2007).  The withdrawal and substitution of counsel, however, are matters of law governed by rather exacting ethical and legal requirements.  *Fisher v. State*, 248 So. 2d 479, 484 (Fla. 1979) ("The relationship of attorney and client is one involving great personal and professional integrity. . . .  Th[at] relationship is governed -not only by laws-but rules of ethics, breaches of which can result in disbarment, punishment worse tha[n] death to a conscientious practitioner.")  Indeed, an attorney may only withdraw in a civil matter "upon due notice to his client and *approval by the court*."  *Id*. at 486  (emphasis added); FLA. R. JUD. ADMIN. §§ 2.505(e), (f) ("The appearance of an attorney for a party in a proceeding shall terminate only in one of the following ways: (1) Withdrawal of Attorney.  *By order of court*. . . .[and] (2) Substitution of Attorney.  *By order of court*. . . .) (alteration in emphasis); Uniform Administrative Policies and Procedures of the Civil Division of the Circuit Court, Orange County, Fla., § 6(b) ("[A]ppearance of additional counsel, substitution and withdrawal of attorneys are governed by the Florida Rule[s] of Judicial Administration . . . and strict adherence to those procedures is required.")  In recognition of these strictures, Carlton Fields provided Heintzelman's with a joint *motion* to re-tender the defense and substitute counsel, which was to be forwarded to Judge Sprinkel (Doc. 153-10 at 1-2).  Lydecker, however, rejected the use of a motion and insisted that McDonald execute a "Stipulation of Substitution of Counsel" form, which the State Court neither approved nor entered as an order.  As a matter of law, then, it is not entirely clear that Ford ever withdrew its defense of Heintzelman's. Assuming, however, that it did, Ford's withdrawal could have occurred no earlier than November 16, 2007 – the day that the "Stipulation of Substitution of Counsel" was filed with the State Court.  Even then, however, Ford continued to affirm its obligation to defend and indemnify Heintzelman's on the pass-through claim.

trailer when the accident occurred; (2) the Thompsons had sworn in their answers to Ford's interrogatories that they were pursing a new theory of active negligence; (3) the Thompsons had filed a response to Heintzelman's motion to strike the case from the trial calendar in which they asserted that Heintzelman's should not have sold the vehicle to Thompson's employer; and (4) Hendricks had represented to the State Court that the Thompsons' were adding a "completely new theory of active negligence." Indeed, even Fidelity has conceded in the parties' joint pre-trial statement that its November 2, 2007 motion to strike was "based on the new theory of liability raised against [Heintzelman's]." (Doc. 164 at 12). Furthermore, if there was any doubt as to whether a direct theory of liability was being asserted against Heintzelman's, events subsequent to Ford's putative withdrawal clearly confirm that the Thompsons were pursuing an active negligence claim.

In sum, Ford's defense of its dealership in the *Thompson* litigation was completely consistent with its obligations under the Sales and Service Agreement. Fidelity's assertions to the contrary are without merit, if not frivolous. Ford is therefore entitled to a judgment as a matter of law on Count I.

## B. Count II – Breach of the Assumption of Defense Agreement

Fidelity's reliance on the Assumption of Defense Agreement for indemnification of its settlement and attorneys' fees is equally unavailing. On its face, a breach of that agreement could occur only if Ford re-tendered without "new and credible evidence" suggesting that it and Heintzelman's no longer had "a unity of interest in the defense" of the *Thompson* litigation. For the reasons, *supra*, Ford had ample credible evidence that its unity of interest in defending

Heintzelman's had been destroyed.[25]  Accordingly, Ford is entitled to a judgment as a matter of law on Count II.

### C.  Count III – Common Law Indemnification

Ford is not liable at common law to indemnify Fidelity for Heintzelman's own negligence. Heintzelman's settlement resolved only the active negligence claims against it, not the pass-through claim of strict liability.  Thus, there is no common law duty to indemnify and Ford is entitled to a judgment as a matter of law on Count III.

### D.  Count IV – FDUTPA

The *sine qua non* of a FDUTPA claim is a "deceptive act" or "unfair practice," i.e., an act that is likely to mislead consumers or a practice that offends established public policy and is otherwise "immoral, unethical, oppressive, unscrupulous or substantially injurious."  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006); FLA. STAT. § 501.204.

This is a contract dispute in which Fidelity makes an unfounded claim for indemnification against Ford.  There is absolutely no evidence that Ford's conduct was deceptive or unfair.[26] Fidelity's FDUTPA claim is spurious and Ford is entitled to a judgment as a matter of law on Count IV.

---

[25]Furthermore, after speaking with Kaster, Carlton Fields and McDonald had a conflict of interest in representing Heintzelman's and were ethically bound to withdraw.  *See* FLA. R. PROF. CONDUCT 4-17(a).

[26]Indeed, if any deception occurred in this case it was perpetrated by Fidelity's charade before Judge Sprinkel, and its disingenuous response to this Court's inquiry regarding same.

## V. Conclusion

For the foregoing reasons, it is

**ORDERED** and **ADJUDGED** that:

1. Defendant Ford Motor Company's Motion for Summary Judgment (Doc. 151) is **GRANTED**;

2. Plaintiff Fidelity & Guaranty Insurance Company's Motion for Summary Judgment is **DENIED**;

3. All other pending motions are **DENIED** as **MOOT**; and

4. The Clerk of the Court is directed to enter judgment in favor of Defendant, Ford Motor Company, and against Plaintiff, Fidelity & Guaranty Insurance Company, on all counts in the Amended Complaint (Doc. 3) and is further directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on April 20, 2010.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE